ams

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| UNITED STATES OF AMERICA, | ) |
| --- | --- |
| Plaintiff, | ) |
| v. | ) Case No. 09-40033-02-JAR |
| DONALD R. HAIRSTON, | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter comes before the Court on defendant Donald Hairston's Motion to Suppress Evidence (Doc. 25) and Motion to Suppress Statement (Doc. 24). The Court conducted an evidentiary hearing on September 21, 2009 and took these motions under advisement at that time. The Court has considered the parties' submissions and the evidence adduced at the hearing and is prepared to rule. As described more fully below, defendant's motions to suppress are denied.

**I. Factual Background**

Kansas Highway Patrol Trooper Scott Walker testified about a traffic stop he made on October 13, 2008. On that date, Trooper Walker was driving westbound on a segment of Interstate 70 ("I-70") in Saline County that was under construction. This was his assigned patrol as a field trooper. The posted speed limit throughout this construction area was 60 m.p.h. Trooper Walker noticed a Kia Rondo vehicle traveling east on I-70 at 76 m.p.h. Trooper Walker's vehicle was equipped with a radar unit, which enabled him to detect that the vehicle was

speeding and measure it's rate of speed..[1]

Trooper Walker immediately turned his vehicle around and followed the Kia as it continued to head east. Trooper Walker testified that there were no intervening vehicles between his vehicle and the Kia and that the Kia slowed down as he began following it through the two-lane portion of I-70 that was under construction. Trooper Walker testified that because there was not much shoulder on this two lane segment of the highway, for safety reasons he opted to not stop the Kia until the road expanded back to four lanes. At that point, Walker activated his emergency lights, this in turn activated the video recorder installed in his patrol vehicle as well as his body pack microphone.[2]

Trooper Walker walked up to the passenger side of the Kia. As he approached, Walker noticed a bracket on the tag of the vehicle indicating that it was a rental car and also noticed that there were four occupants in the Kia. The only female, who was the front seat passenger, rolled down her window, as did the male occupant in the seat directly behind her. Walker saw one of the back-seat passengers, later identified as co-defendant Thurmond Hairston, counting a large stack of cash; Walker could see many $100 bills. Trooper Walker had previously noticed, while following the Kia, that Thurmond Hairston appeared to be looking straight north, refusing to make eye contact yet trying to watch Walker with his peripheral vision. Trooper Walker identified defendant Donald R. Hairston as the other back seat passenger, sitting directly behind the female front seat passenger. Trooper Walker explained to the occupants of the vehicle why he

---

[1] Trooper Walker testified that he conducts daily internal checks on the radar unit; a circuit test and calibration check. He testified that he conducted these checks prior to his patrol on October 13, 2008 and that the system passed these checks, according to his training and experience.

[2] (Ex. 1.) The Court notes that the audio on Ex. 1 is of extremely poor quality, so it is difficult to understand.

had stopped the vehicle; and he asked the driver for identification. The driver, Thomas Mulkey, began rambling and did not provide him with identification, stating that he had lost his identification in Las Vegas. Mulkey indicated that Thurmond Hairston had been driving the vehicle, but that Mulkey had relieved Thurmond Hairston because he was tired.

One of the occupants provided Trooper Walker with the rental agreement for the vehicle. The rental agreement stated that the vehicle was rented to Thurmond Hairston and that the vehicle was only permitted to travel in the states of Utah, Arizona, California, and Nevada. The agreement prohibited drivers other than Thurmond Hairston. Trooper Walker also collected the other three occupants' identification. While he was standing next to the Kia, Trooper Walker smelled raw marijuana emanating from the vehicle, which he recognized from his training and experience in the field.

Trooper Walker next called the dispatch operator to search the names and criminal history of all four of the occupants of the vehicle, and to check the registration of the vehicle itself. Trooper Walker seated Mulkey in his patrol car for about ten or fifteen minutes, during which time Trooper Walker smelled raw marijuana on Mulkey's person. Mulkey told Trooper Walker that he had a driver's license, but dispatch responded to Trooper Walker that Mulkey's Virginia driver's license was suspended. Trooper Walker then asked Mulkey to stand in front of the patrol car, placed Mulkey under arrest, and patted him down. In Mulkey's right coin pocket, Trooper Walker found a plastic bag that appeared to contain about five grams of marijuana. Trooper Walker secured Mulkey in the patrol car and, at that time, considered Mulkey under arrest for driving with a suspended license and for possession of marijuana. Mulkey adamantly and repeatedly stated that the only drugs were on his person and not in the vehicle.

During the encounter, Trooper Walker had noticed the occupants of the Kia were extremely nervous. He could see Mulkey's chest beating. Trooper Walker observed Thurmond Hairston literally hanging outside the car door smoking a cigarette. At least two of the Kia's windows were rolled down during the stop and Trooper Walker continued to smell raw marijuana. Trooper Walker intended to search the vehicle after arresting Mulkey and called Master Trooper Davis for assistance since there were three remaining occupants to secure before the vehicle could be safely searched.

After Master Trooper Davis arrived and Trooper Walker briefed him on the events that had transpired, they directed the other three occupants to step out of the vehicle, patted them down, and directed them to stand in a ditch that was approximately twenty feet away from the vehicle. The troopers did not ask for consent to search and proceeded to search the vehicle and a plastic storage compartment in the floor behind the rear seat. Inside the compartment, the troopers found a footlocker bag containing a white plastic bag. Inside the plastic bag were two kilo-sized bricks of a substance that appeared to be cocaine. At this time, the troopers arrested the other three occupants.

David Heim, a Kansas Highway Patrol Trooper and Drug Enforcement Administration ("DEA") Task Force Officer ("TFO"), was contacted soon after the arrests to interview the occupants of the Kia. When he arrived in Salina, TFO Heim first spoke to Troopers Walker and Davis and looked at the Kia. TFO Heim considered defendant Donald Hairston to be in custody, as he was being held in the Highway Patrol building, in a holding room with a one-sided lock. When TFO Heim arrived, Donald Hairston was asleep, so he and TFO Michael Morland woke him.

The interview began at about 9:45 p.m. on October 13. The officers introduced themselves and TFO Heim read defendant his *Miranda* rights. The interview lasted for thirty-six minutes and was audio recorded.³ Most of the discussion was conversational. TFO Heim testified that he did not raise his voice until the end of the discussion when he became frustrated that defendant was giving him inconsistent accounts of what happened. TFO Heim did not believe that defendant was confused or that he was impaired, although defendant did indicate that he was taking medication for a stomach problem and "for my nerves." Defendant never stated during the interview that he wished to speak to an attorney.

## II. Discussion

### A. Traffic Stop

Defendant moves to suppress, arguing that the initial traffic stop was not justified at its inception, the stop was unreasonably prolonged, and the search was not warranted as a search incident to arrest. The government argues that defendant lacks standing to object to the search of the vehicle, as he had no possessory or proprietary interest in it.

Under *Brendlin v. California*,⁴ the passenger of a vehicle subject to a traffic stop has standing to challenge the initial stop, their own seizure, and any evidence derived from that seizure.⁵ But it does not follow that a passenger has standing to contest the search of the vehicle itself when that person lacks a possessory or property interest in the vehicle.⁶

---

³(Ex. 2.)

⁴551 U.S. 249 (2007).

⁵*Id.* at 254–56; *see also United States v. Martinez*, 537 F. Supp. 2d 1153, 1156 (D. Kan. 2008).

⁶*United States v. Cortez-Galaviz*, 495 F.3d 1203, 1206 (10th Cir. 2007), *cert. denied*, 128 S. Ct. 933 (2008).

5

Defendant does not argue that he has direct standing to contest the search of the vehicle driven by Mulkey. Instead, he contends that he has standing to challenge the search by virtue of the fact that he was illegally detained and that the seizure constitutes fruit of that illegal detention. Under these circumstances, defendant "must first establish that the detention did violate his Fourth Amendment rights."[7] Then, defendant must show "a factual nexus between the illegality and the challenged evidence."[8] If defendant is able to make these two showings, the burden shifts to the government to show that the evidence is not fruit of the poisonous tree.[9]

1.  **Whether the Detention Violated Defendant's Rights**

The first step of the standing analysis requires the Court to evaluate the legality of defendant's detention during the traffic stop. "'A traffic stop is a "seizure" within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention quite brief.'"[10] The principles of *Terry v. Ohio*[11] apply to such traffic stops. Thus, the reasonableness of a stop depends on "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."[12]

Defendant first argues that the stop was not justified at its inception. Tenth Circuit cases

---

[7]*United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir.), *cert. denied*, 531 U.S. 887 (2000).

[8]*Id.* (quotation omitted).

[9]*Id.*

[10]*United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001) (en banc) (quoting *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998) (further quotation omitted)).

[11]392 U.S. 1 (1968).

[12]*Id.* at 19–20.

6

establish that "a detaining officer must have an objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring before stopping [an] automobile."[13] Reasonable suspicion may be supported by an "objectively reasonable" good faith belief even if premised on factual error.[14]

Defendant asserts that the vehicle was not speeding and argues that the government must prove that the trooper had a reliable method of measuring the speed of the vehicle and for believing the correct vehicle had been stopped. Under Kansas law, operating a vehicle at a speed in excess of the maximum speed limit is a traffic violation.[15] Trooper Walker testified that he observed the vehicle speeding in a construction zone that had a 60 m.p.h. posted speed limit and that he verified the vehicle's speed with a radar device that he had tested for accuracy that day. There is no evidence in the record to suggest that the radar was not reliable, nor that the vehicle was not in fact speeding. Also, Trooper Walker testified that there were no intervening vehicles between his patrol car and the Kia when he turned around to head east. Therefore, the Court easily finds that the stop was justified at its inception.

Even if the initial stop of defendant's vehicle was legitimate, the detention must be "reasonably related in scope to the circumstances which justified the interference in the first place," as required under *Terry*.[16] "Generally, an investigative detention must last no longer than

---

[13] *United States v. Cervine*, 347 F.3d 865, 869 (10th Cir. 2003); *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir. 1993).

[14] *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004). In a footnote, defendant invites the Court to ignore the Tenth Circuit authority stating that reasonable suspicion of a traffic violation is all that is necessary to justify a traffic stop, and instead, find that probable cause is required. The Court declines.

[15] K.S.A. §§ 8-1558 to 1559.

[16] *United States v. Williams*, 271 F.3d 1262, 1266 (10th Cir. 2001), *cert. denied*, 535 U.S. 1019 (2002); *United States v. Bustillos-Munoz*, 235 F.3d 505, 512 (10th Cir. 2000), *cert. denied*, 534 U.S. 854 (2001).

is necessary to effectuate the purpose of the stop."[17] However, "an officer conducting a traffic stop may request vehicle registration and a driver's license, run a computer check, ask about travel plans and vehicle ownership, and issue a citation."[18] Upon issuing a citation or warning and determining the validity of the driver's license and right to operate the vehicle, the officer usually must allow the driver to proceed without further delay.[19] After the purpose of a traffic stop is complete, "further detention for purposes of questioning unrelated to the initial stop" is generally impermissible.[20] In general, prolonging the detention for further questioning beyond that related to the initial stop is permissible in two circumstances: (1) if the officer has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring; or (2) if the initial detention has become a consensual encounter.[21]

During the course of requesting the driver's and occupants' identification and registration, Trooper Walker learned that the driver had a suspended license and that the rental vehicle, which had been rented to one of the passengers and not to the driver, was not authorized to travel in the State of Kansas. Upon arresting Mulkey and patting him down, Trooper Walker found about five grams of marijuana on his person. In addition to this information, Trooper Walker had noted the following circumstances: (1) the occupants' nervousness throughout the stop, notably all of them were overly talkative upon initial contact; (2) strong odor of raw marijuana in the vehicle during

---

[17]*Cervine*, 347 F.3d at 870–71(internal quotation omitted); *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999).

[18]*United States v. Zubia-Melendez*, 263 F.3d 1155, 1161 (10th Cir. 2001); *see Illinois v. Caballes*, 543 U.S. 405, 407 (2005) ("[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.").

[19]*Patten*, 183 F.3d at 1193 (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)).

[20]*United States v. Bradford*, 423 F.3d 1149, 1156–57 (10th Cir. 2005).

[21]*United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998).

the initial encounter; and (3) one of the rear passengers was counting a large sum of money during the initial contact.[22] The Court finds that Trooper Walker had reasonable suspicion to believe that illegal activity had occurred or was occurring, given the totality of these circumstances.

The Court further finds that the above factors provided probable cause to search the vehicle.[23] Defendant argues that when Trooper Walker found the marijuana on Mulkey's person, it should have dispelled any further suspicion that there was marijuana in the vehicle. But after Trooper Walker found Mulkey's marijuana, Mulkey proceeded to insist there were no drugs in the vehicle, only the marijuana on Mulkey's person. These statements further enhanced Trooper Walker's probable cause determination.

Defendant also contends that the officer's statement that he smelled raw marijuana is not credible given that no raw marijuana was ultimately found in the vehicle. But the Court finds Trooper Walker's testimony credible on this point. "An officer's detection of the smell of drugs in a vehicle is entitled to substantial weight in the probable cause analysis."[24] Trooper Walker testified that he had been through two training classes and the Kansas Highway Patrol training academy, where he learned to detect the smell of raw marijuana. He also estimated that he smelled raw marijuana four to five times per month during traffic stops, in the course of his duties as a trooper. The fact that Trooper Walker did not ultimately find marijuana, and instead found cocaine, does not dissipate his credibility for purposes of the probable cause analysis.

---

[22]The government also points to the fact that Trooper Walker learned from dispatch that all four occupants had a prior record of drug-related convictions. But this testimony was not elicited during the evidentiary hearing, only the fact that he asked dispatch for that information.

[23]*See, e.g.*, *United States v. Ozbirn*, 189 F.3d 1194, 1200 (10th Cir. 1999) (finding odor of raw marijuana in addition to nervousness and a vague description of travel plans satisfies probable cause); *see also United States v. Robinson*, 146 F. App'x 255, 261–62 (10th Cir. 2005).

[24]*United States v. Zabalza*, 346 F.3d 1255, 1259 (10th Cir. 2003).

Assuming there was no probable cause to justify the search and that the search could only be justified as a search incident to Mulkey's arrest, defendant argues that the search of the vehicle was not appropriate under *Arizona v. Gant*.[25] *Gant* holds that officers may only search a vehicle incident to arrest "if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest."[26] The government contends that one of the offenses of arrest was Mulkey's possession of marijuana, discovered during his pat-down search, so it was reasonable to believe that the vehicle contained further evidence of this crime, especially coupled with the fact that Trooper Walker had detected the odor of raw marijuana. Furthermore, the government argues that even if this was not reasonable, the officers had a good faith belief that the search was justified under the rule in *New York v. Belton*,[27] which was the governing law at the time of the search.[28] For substantially the same reasons set forth by the government, the Court agrees that the search would have been justified even if there had not been probable cause to search based on the offense of the arrest and the good faith doctrine.

2.   **Nexus**

Assuming, *arguendo*, that defendant could show that he was unlawfully detained, he must also show that "the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct."[29] "In other words, '[i]n order to meet his initial burden

---

[25] 129 S. Ct. 1710, 1718–19 (2009).

[26] *Id.* at 1723.

[27] 453 U.S. 454 (1981).

[28] *United States v. McCane*, 573 F.3d 1037, 1044–45 (10th Cir. 2009).

[29] *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir.), *cert. denied*, 531 U.S. 887 (2000).

under *Nava-Ramirez* and demonstrate the required factual nexus, [a defendant] must show that the [contraband] would never have been found but for *his*, and only his, unlawful detention.'"[30] Defendant argues that because Thurmond Hairston was the renter of the vehicle and a licensed driver, he should have been allowed to drive away after Mulkey was arrested on the suspended license and marijuana possession charges. The Court disagrees.

The evidence adduced at the hearing overwhelmingly supports the contention that Trooper Walker would have searched the vehicle regardless of whether defendant was detained. First, Trooper Walker credibly testified that he would have denied defendant's request to leave the scene in the Kia during the encounter, as he did not have a valid driver's license and was not listed on the rental agreement. Second, based on the circumstances already discussed, Trooper Walker had developed probable cause to search the vehicle, so even if he had allowed defendant to walk away from the encounter, he would not have been able to drive away in the Kia. Third, there is no evidence in the record to suggest that Trooper Walker searched the vehicle based on information obtained from defendant during the traffic stop. The circumstances forming Trooper Walker's development of probable cause were largely based on the behavior and statement of the other occupants, especially Mulkey, and on the odor of raw marijuana. Therefore, the Court is unable to find a factual nexus between defendant's allegedly illegal detention and the cocaine found in the Kia. Because defendant lacks standing to object to the search of the vehicle, his motion to suppress is denied.

**B.** *Statement*

Defendant argues that his statements to TFO Heim must be suppressed because he was

---

[30]*United States v. Ladeaux*, 454 F.3d 1107, 1111 (10th Cir. 2006) (quoting *United States v. DeLuca*, 269 F.3d 1128, 1133 (10th Cir. 2001)).

awoken by the officer, immediately read his rights, and was never asked if he understood those rights before the interrogation began. The government contends that the evidence shows defendant implicitly waived his rights under *Miranda* and that the statements were voluntarily made.

After a suspect has been advised of his rights under *Miranda v. Arizona*,[31] he "may waive effectuation of these rights provided the waiver is made voluntarily, knowingly, and intelligently."[32] For the *Miranda* safeguards to apply, (1) "the suspect must be in 'custody,' and [(2)] the questioning must meet the legal definition of 'interrogation.'"[33]

The government bears the burden of showing that the *Miranda* rights were waived and the voluntariness of the statements.[34] "But '[a]n express statement of waiver by the defendant is not required; instead, waiver can be inferred from the defendant's actions and words.'"[35] A waiver is knowing and intelligent when it is "made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."[36] The Court finds that TFO Heim's *Miranda* warning, provided before the interrogation began, was sufficient to apprise this defendant both of the nature of the right being abandoned and the consequences of his decision to abandon it. There is no requirement that the defendant explicitly state on the record that he

---

[31]384 U.S. 436 (1966).

[32]*Id.* at 444.

[33]*United States v. Ritchie*, 35 F.3d 1477, 1485 (10th Cir. 1994) (quoting *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993)).

[34]*Missouri v. Seibert*, 542 U.S. 600, 609 n.1 (2004) (plurality); *United States v. Nelson*, 450 F.3d 1201, 1209 (10th Cir.), *cert. denied*, 127 S. Ct. 326 (2006).

[35]*Nelson*, 450 F.3d at 1209 (quoting *United States v. Toro-Pelaez*, 107 F.3d 819, 825 (10th Cir. 1997)).

[36]*United States v. Alarcon*, 95 F. App'x 954, 956 (10th Cir. 2004); *see also United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir. 1990).

understood his rights under *Miranda* and that he expressly waives those rights. TFO's warning, coupled with the fact that defendant proceeded to speak to TFO Heim for over thirty minutes, is sufficient to establish waiver under the circumstances. There was no language barrier, nor was there any indication that defendant was impaired or confused. Defendant knowingly and intelligently waived his *Miranda* rights.

Even when a defendant's *Miranda* rights are not violated, the court must still conduct a Fifth Amendment inquiry into the voluntariness of any statement.[37] The court looks to the totality of the circumstances in determining whether the statements were voluntary.[38] In considering whether a statement is made of free will, the courts look to several factors, including: "(1) the characteristics of the defendant: age, education, intelligence, and physical and emotional attributes; (2) the circumstances surrounding the statement, including the length of detention and questioning and the location of questioning; and (3) the tactics, if any, employed by officers. . . . In no case, however, is any single factor determinative."[39] A confession "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence."[40] Coercive police activity is a necessary predicate to a finding that a confession is not voluntary within the meaning of the due process clause.[41]

The Court is unable to find that defendant's statement offended due process. While defendant was sleeping prior to the interview, TFOs Heim and Morland can clearly be heard on the

---

[37]*United States v. Roman-Zarate*, 115 F.3d 778, 783 (10th Cir. 1997).

[38]*United States v. Glover*, 104 F.3d 1570, 1579 (10th Cir. 1997).

[39]*United States v. Chalan*, 812 F.2d 1302, 1307 (10th Cir. 1987), *cert. denied*, 488 U.S. 983 (1988).

[40]*Malloy v. Hogan*, 378 U.S. 1, 7 (1964).

[41]*See United States v. Erving L.*, 147 F.3d 1240, 1249 (10th Cir. 1998).

13

audio recording waking defendant.  The officers ensured that defendant was not intoxicated or impaired and he told them that the medication found on his person after the arrest was an antacid he took for stomach problems.  He stated later that he took medication "for his nerves," but did not appear to be impaired, confused, or intoxicated.  Defendant is an adult who sounded to be of average intelligence.  The length of the detention was thirty-six minutes, not unduly long, and was conducted at the Highway Patrol building in Salina, Kansas.  There is no indication of police tactics during the interview, nor any evidence of threats, violence, or promises being attached to certain statements, nor any other form of improper influence.  This is made most evident by the fact that defendant ended the interview himself, stating that he was through talking to the officers.  While TFO Heim did raise his voice somewhat toward the end of the interview, in the context of telling defendant that his story was not credible, the audio recording reveals no coercion on the part of either officer involved in the interview.

Because the Court finds that defendant properly waived his *Miranda* rights and that his statement was voluntary pursuant to the Fifth Amendment, the Court denies defendant's motion to suppress his statement.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motion to Suppress Evidence (Doc. 25) and Motion to Suppress Statement (Doc. 24) are **denied**.

**IT IS SO ORDERED.**

Dated:  October 15, 2009

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE